1
2
3
4
5
6
7
8
9

**UNITED STATES DISTRICT COURT**

**SOUTHERN DISTRICT OF CALIFORNIA**

| | |
|---|---|
| VALERIANO CAMPOS ELVIRA, *et al.*, | Case No. 14-cv-00081-BAS(NLS) |
| Plaintiffs, | **ORDER GRANTING IN PART DEFENDANTS' MOTION FOR SUMMARY JUDGMENT** |
| v. | **[ECF No. 30]** |
| CITY OF ESCONDIDO, *et al*., | |
| Defendants. | |

Plaintiffs Valeriano Campos Elvira and Celia Martinez Rosales bring this civil rights action under 42 U.S.C. § 1983 and California state law against Defendants City of Escondido ("City"), Officer Marco Fuentes, and Officer Patrick Hand. (First Am. Compl., ECF No. 14.) This action arises out of a police shooting that caused the death of Plaintiffs' son, Pedro Martinez Campos. (*Id.*) Defendants move for summary judgment on each of Plaintiffs' six claims. (ECF No. 30.) Plaintiffs oppose. (ECF No. 39.) After hearing oral argument (ECF No. 45), the Court **GRANTS IN PART** Defendants' motion for the following reasons.

//

//

## I.  **BACKGROUND**

Plaintiffs Valeriano Campos Elvira and Celia Martinez Rosales are the parents of Decedent Pedro Martinez Campos ("Campos"). (Joint Statement of Undisputed Facts ("JSUF") ¶ 1, ECF No. 40-1.) At the time of the incident, Mr. Campos was an unmarried, twenty-nine year old Mexican national living in the United States. (*Id.* ¶ 2.) In January 2013, Mr. Campos "began an online chat room relationship with Josephina Zwer." (*Id.* ¶ 3.) Mr. Campos and Ms. Zwer "met in person approximately four times and communicated over the phone and in writing via text messaging multiple times per day." (*Id.* ¶ 5.) During their relationship, Ms. Zwer perceived that Mr. Campos "was lonely and had few friends." (*Id.* ¶ 6.)

Near the end of April 2013, Ms. Zwer told Mr. Campos "that she did not want to continue the relationship with him for various reasons including [his] anger and control issues and her potential reconciliation with her husband." (JSUF ¶ 7.) Mr. Campos repeatedly told her "that he wanted to be with her and that if she ended the relationship, he would hurt or kill himself." (*Id.* ¶ 8.)

### A.  **9-1-1 Call**

"On the evening of May 4, 2013, starting around 5:45 p.m. and ending around 7:43 p.m., [Mr. Campos] initiated a series of phone text messages and phone calls with Ms. Zwer." (JSUF ¶ 9.) The gist of these messages was that Mr. Campos "wanted to continue the relationship with her, but if he couldn't, he didn't want to live anymore and was going to hurt himself." (*Id.* ¶ 12.) One of the text messages, sent at 7:43 p.m., provided that Mr. Campos "had a piece of paper in his pocket for her that said goodbye." (*Id.* ¶ 11.) Ms. Zwer told Mr. Campos via text message "that she did not want to have any further contact with him and to leave her alone." (*Id.* ¶ 10.)

That same night, Mr. Campos "placed a hang-up 9-1-1 call from his cell phone" to the Escondido Police Department. (JSUF ¶ 13.) During a callback from the

police dispatcher in which a Spanish interpreter assisted the dispatcher, Mr. Campos "asked for police to come to Washington Avenue and Citrus Avenue in the City and said there would be a 'tragedy' or 'misfortune' if they didn't come to the location and hung up again." (*Id.* ¶ 14; *see also* 9-1-1 Call, Defs.' Ex. 1A, ECF No. 30-8.) Mr. Campos "did not identify himself or any specific problem for which he needed the police." (JSUF ¶ 15.)

### B.  Initial Encounter

Then, around 10:47 p.m., the police department dispatched Officers Patrick Hand and Paul Smyth via a radio call regarding "an incomplete 9-1-1 call received from a male requesting police assistance at Washington Avenue and Citrus Avenue in the City of Escondido." (JSUF ¶ 16.) The responding officers did not receive "any specific details as to the type of assistance needed by the caller." (*Id.* ¶ 17.) Officers Hand and Smyth drove to the designated area in their marked police vehicles and while wearing their official uniforms. (*Id.* ¶ 18.) Another officer, Officer Marco Fuentes, advised the police dispatch that he would also respond to the call to assist with translation services. (*Id.* ¶ 19.)

When Officer Hand arrived in the area of Washington Avenue and Citrus Avenue, "he noticed a male in the street near the sidewalk on Washington. Another vehicle driving eastbound on Washington in front of Officer Hand swerved around the male in the street." (JSUF ¶ 20.) The officer "believed that the individual he saw in the road might be the individual who requested help and that he was trying to flag down a regular citizen." (*Id.*) "Officer Hand activated his overhead lights, pulled over and parked his car after noticing that one of [Mr. Campos]'s hands was underneath his sweatshirt and the other hand was in his pocket." (*Id.* ¶ 21.)

After exiting his vehicle with his flashlight, Officer Hand approached Mr. Campos and asked him "if he needed any help and if he had called the police." (JSUF ¶ 22.) Mr. Campos replied, "no, no, no," and he "continued to walk away from the

officer towards Trovita Court." (*Id.*) Officer Hand then advised Mr. Campos "that he wanted to talk to him and to have a seat so he could help him." (*Id.*) Mr. Campos responded in Spanish, and "Officer Hand told him that he did not speak Spanish, but that a translator would be coming." (*Id.*)

### C.   Code 3 Cover

Mr. Campos continued to walk down the street on the sidewalk. (JSUF ¶ 23.) "At first using a low key calm voice to gain compliance, Officer Hand asked [Mr. Campos] to sit down." (*Id.*) Because it was dark and Mr. Campos's hands "were hidden from the officer by his sweatshirt," Officer Hand also instructed him to show his hands for safety reasons. (*Id.*) Mr. Campos "continued walking, looking down and ignoring the officer's commands." (*Id.*) The officer and Mr. Campos were walking in a quiet residential neighborhood, "with the only lighting coming from nearby street lights and the ambient lighting from the adjacent homes." (*Id.* ¶ 24.) Some residents were outside of their homes. (*Id.*) As Mr. Campos walked down Trovita Court, "he passed by residents and they moved away from the sidewalk." (*Id.* ¶ 25.) During this time, Mr. Campos "switched positions with his hands underneath his sweatshirt several times." (*Id.*)

Because Mr. Campos did not comply with Officer Hand's command to see his hands, Officer Hand raised his voice and demanded Mr. Campos show his hands in "what little Spanish [Officer Hand] know[s], saying 'manos, manos, manos, arriba.'" (Hand Decl. ¶ 9, ECF No. 30-4.) Mr. Campos "raised his right hand and then lifted up his sweatshirt and revealed he was holding the handle of a knife with his left hand with the blade pointed towards his stomach." (*Id.*) Mr. Campos "did not stop walking, did not put the knife away, or communicate with [Officer Hand] as to his intentions in Spanish or English." (*Id.*) Therefore, Officer Hand was concerned Mr. Campos "could use that knife against himself or the nearby residents should he immediately launch an attack." (*Id.*)

14cv0081

With this concern, Officer Hand relayed by radio to dispatch that the subject at the location had a knife and requested Code 3 cover—which signifies a need for immediate assistance from other officers. (Hand Decl. ¶ 9; *see also* Police Dispatch Call at 03:08–03:11, Defs.' Ex. 1B, ECF No. 30-8 ("Code 3 he's got a knife."); JSUF ¶ 26.) After making this request, Officer Hand "transitioned from his flashlight to his handgun that was equipped with a flashlight under the barrel." (JSUF ¶ 27.) "Officer Hand positioned himself approximately 12 – 15 feet away" from Mr. Campos while walking south with him. (*Id.* ¶ 28.) As he walked backwards while facing Mr. Campos, Officer Hand continued to tell him to "get down on the ground." (*Id.*) Officer Hand wanted to stop Mr. Campos's advancement "as there were individuals outside in the area." (*Id.*)

During this time, Mr. Campos "would stop for a moment and then continue walking as the sounds of the sirens of additional police vehicles could be heard in the distance." (JSUF ¶ 29.) He "kept switching his hands back and forth from underneath his sweatshirt." (*Id.*) Officer Hand and Mr. Campos "continued to walk down the sidewalk together, facing each other," as the officer kept his gun aimed at Mr. Campos and continuously ordered him in a raised voice to "stop and get on the ground." (*Id.* ¶ 30.) By this time, Officer Smyth had arrived on the scene. (Smyth Decl. ¶ 8, ECF No. 30-5.) Officer Smyth commanded Mr. Campos in a loud voice to "get on the ground or drop the knife." (JSUF ¶ 30.) "At this instance, Officer Hand stopped moving." (*Id.* ¶ 31.)

### D.    <u>Arrival of Officer Fuentes</u>

Officer Fuentes—the officer who had replied to the police dispatch that he would respond to the call to provide translation services—arrived in the area around this time. (JSUF ¶¶ 19, 32.) He came running towards the location of Mr. Campos and "had activated his body camera shortly before arriving on scene." (*Id.* ¶ 32.)

//

As depicted in the footage from his body camera, Officer Fuentes arrives on scene, exits his vehicle, and turns towards Officer Hand's parked patrol car. (Footage from Officer Fuentes's Body Camera ("Fuentes Video"), Defs.' Ex. 3 at 00:27–00:35, ECF No. 30-11; *see also* Fuentes Decl. ¶ 7, ECF No. 30-3 (authenticating body camera footage and describing arrival on the scene).) Because Officer Fuentes does not see Officer Hand and the subject near Officer Hand's parked patrol car, Officer Fuentes begins walking towards the intersection of Washington Avenue and Trovita Court. (Fuentes Decl. ¶ 8; *see also* Fuentes Video at 00:35–00:40.) Officer Fuentes saw what he believed to be Officer Hand's flashlight "quite a ways down Trovita Court." (Fuentes Decl. ¶ 8.) From that position, Officer Fuentes states he could see the subject—Mr. Campos—and it appeared that Officer Hand was trying to walk backwards. (*Id.* ¶ 9.) Officer Fuentes started running down the sidewalk and then into the street towards the location of Officer Hand and Mr. Campos. (Fuentes Decl. ¶ 9; *see also* Fuentes Video at 00:41–01:04.) While running, Officer Fuentes "could hear the officers ordering [Mr. Campos] to get on the ground several times." (Fuentes Decl. ¶ 9; *see also* Fuentes Video at 00:48–01:05; Transcript of Video Footage at 2:11–18, ECF No. 30–12 (transcribing commands heard on body camera footage, including "Get on the ground," and "Get the fuck on the ground"); Fuentes Decl. ¶ 7 (providing foundation for audio transcript).)

As Officer Fuentes moved into the middle of the street and "positioned [himself] in the street at a 90-degree angle from Officer Hand who was still on the sidewalk," he noticed Mr. Campos "had his right hand in and/or under his shirt or sweatshirt." (Fuentes Decl. ¶ 10.) Mr. Campos looked at Officer Fuentes for a moment, back at Officer Hand, and then "began to pull his hand out from underneath his shirt or sweatshirt." (*Id.* ¶¶ 10–11.) The "movement of his right hand in his waistband indicated to [Officer Fuentes] that he was trying to pull out some weapon." (*Id.* ¶ 11.) Mr. Campos "appeared to struggle to get his right hand out from underneath his shirt or sweatshirt." (*Id.*)

Officer Smyth deployed his Taser at Mr. Campos, "but it did not cause any noticeable effect on his body movements as would be expected" when a Taser is successfully deployed. (JSUF ¶ 34.) Officer Fuentes's "body camera recorded the hissing sound of the Taser shot by Officer Smyth who was standing to [his] left." (*Id.* ¶ 33; *see also* Fuentes Video at 01:07–01:09.) Mr. Campos "was standing still when the Taser was deployed and facing the officers surrounding him." (JSUF ¶ 33.)

Mr. Campos then turned towards Officer Hand and started rushing at the officer. (Fuentes Video at 01:08–01:10; *see also* Smyth Decl. ¶¶ 13–14; Hand Decl. ¶ 13; Fuentes Decl. ¶ 12.) Officers Hand and Fuentes fired their weapons at Mr. Campos "as Officer Hand tried to move into the street and out of the line" of Mr. Campos's movement. (JSUF ¶ 35.) Mr. Campos "eventually dropped to the ground." (*Id.*) Moments later, Officer Fuentes can be heard stating, "He's got a knife still in his right hand, knife still in the right hand." (Fuentes Video at 01:18–01:22.) At the time Mr. Campos "moved in the direction of Officer Hand, the officers only had 1-2 seconds to make the decision to shoot," and "Officer Hand had no physical barrier to protect himself from [Mr. Campos]'s advancement." (JSUF ¶¶ 36, 37.) Although the incident is described in detail here, only three to four minutes elapsed from the time Officer Hand arrived on the scene to when shots were fired. (Hand Decl. ¶ 14; *see also* Police Dispatch Call at 00:38–04:39.)

The officers administered first aid to Mr. Campos until paramedics arrived on the scene shortly thereafter. (JSUF ¶ 38.) Mr. Campos had a handwritten note to Ms. Zwer in his pocket that effectively said "he loved her and today would be his last day." (*Id.* ¶¶ 39, 40.)

### E.     Use of Force Policy

"At the time of the incident, the City's Police Department had written policies governing the use of force and Tasers." (JSUF ¶ 43.) "The City's Use of Force Policy, Department Instruction No. 1.24, in effect at the time of this incident, allows for the

use of deadly force when an officer has probable cause to believe that such force is necessary to protect himself or others from death or seriously bodily harm." (*Id.* ¶ 44.) The City's Taser policy "allowed for deployment when a suspect poses an immediate threat to the safety of an officer and [deployment would be] consistent with the department's use of force policy." (*Id.* ¶ 45.) "In written discovery, Plaintiffs have identified no specific pre-shooting tactical errors made by the Defendants." (*Id.* ¶ 46.)

### F.   Plaintiffs' Claims

On January 1, 2014, Plaintiffs commenced this action. (ECF No. 1.) They filed a First Amended Complaint on November 10, 2014, that contains the following claims:

1. Violation of Civil Rights Causing Wrongful Death against all Defendants;
2. Failure to Supervise, Unlawful Policies, Customs and Habits Causing Constitutional Violations (*Monell* Claim) against Defendant City;
3. Negligence Causing Wrongful Death against Defendants Hand and Fuentes;
4. Battery against Defendants Hand and Fuentes;
5. Violation of California Civil Code Section 52.1 against all Defendants; and
6. Civil Conspiracy against all Defendants.

(First Am. Compl. ¶¶ 26–53, ECF No. 14.) Defendants move for summary judgment in their favor on all of Plaintiffs' claims. (ECF No. 30.)

## II.   LEGAL STANDARD

Summary judgment is appropriate under Rule 56(c) where the moving party demonstrates the absence of a genuine issue of material fact and entitlement to judgment as a matter of law. *See* Fed. R. Civ. P. 56(c); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). A fact is material when, under the governing substantive law,

14cv0081

it could affect the outcome of the case. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A dispute about a material fact is genuine if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.* at 248.

A party seeking summary judgment always bears the initial burden of establishing the absence of a genuine issue of material fact. *Celotex*, 477 U.S. at 323. The moving party can satisfy this burden in two ways: (1) by presenting evidence that negates an essential element of the nonmoving party's case; or (2) by demonstrating that the nonmoving party failed to make a showing sufficient to establish an element essential to that party's case on which that party will bear the burden of proof at trial. *Id.* at 322–23. "Disputes over irrelevant or unnecessary facts will not preclude a grant of summary judgment." *T.W. Elec. Serv., Inc. v. Pac. Elec. Contractors Ass'n*, 809 F.2d 626, 630 (9th Cir. 1987).

If the moving party meets this initial burden, the nonmoving party cannot defeat summary judgment merely by demonstrating "that there is some metaphysical doubt as to the material facts." *Matsushita Electric Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986); *see also Triton Energy Corp. v. Square D Co.*, 68 F.3d 1216, 1221 (9th Cir. 1995) ("The mere existence of a scintilla of evidence in support of the nonmoving party's position is not sufficient.") (citing *Anderson*, 477 U.S. at 252). Rather, the nonmoving party must "go beyond the pleadings and by 'the depositions, answers to interrogatories, and admissions on file,' designate 'specific facts showing that there is a genuine issue for trial.'" *Celotex*, 477 U.S. at 324 (quoting former Fed. R. Civ. P. 56(e)).

When making this determination, the court must view all inferences drawn from the underlying facts in the light most favorable to the nonmoving party. *See Matsushita*, 475 U.S. at 587. "Credibility determinations, the weighing of evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge, [when] he [or she] is ruling on a motion for summary judgment." *Anderson*, 477 U.S. at 255.

III.   **ANALYSIS**

    A.    <u>Section 1983 Claim – Individual Officers</u>[1]

Plaintiffs' first claim for relief under 42 U.S.C. § 1983 alleges Officers Hand and Fuentes (1) violated Mr. Campos's Fourth Amendment rights and (2) deprived Plaintiffs of their right to a familial relationship with their son under the Fourteenth Amendment. "Public officials are immune from suit under 42 U.S.C. § 1983 unless they have 'violated a statutory or constitutional right that was clearly established at the time of the challenged conduct.'" *City & Cty. of S.F., Cal. v. Sheehan*, --- U.S. ---, 135 S. Ct. 1765, 1774 (2015) (quoting *Plumhoff v. Rickard*, 572 U.S. ---, 134 S. Ct. 2012, 2023 (2014)). "An officer 'cannot be said to have violated a clearly established right unless the right's contours were sufficiently definite that any reasonable official in [his] shoes would have understood that he was violating it,' meaning that 'existing precedent . . . placed the statutory or constitutional question beyond debate.'" *Id.* (alteration in original) (citation omitted) (quoting *Plumhoff*, 134 S. Ct. at 2023; *Ashcroft v. al-Kidd*, 563 U.S. ---, 131 S.Ct. 2074, 2083 (2011)).

To determine whether an officer is entitled to qualified immunity, the court employs a two-step test: first, it decides "whether the officer violated a plaintiff's constitutional right; if the answer to that inquiry is 'yes,'" then the court proceeds to "determine whether the constitutional right was 'clearly established in light of the specific context of the case' at the time of the events in question.'" *Mattos v. Agarano*, 661 F.3d 433, 440 (9th Cir. 2011) (en banc) (quoting *Robinson v. York*, 566 F.3d 817, 821 (9th Cir. 2009)). The court has discretion to address either prong of the two-step qualified immunity analysis first. *Id.*

//

---

[1] Plaintiffs bring their first claim under 42 U.S.C. § 1983 against not only the individual officers, but also the City. (First Am. Compl. ¶¶ 26–32.) However, because the City cannot be held liable on a theory of respondeat superior and this claim does not contain *Monell* allegations, Plaintiffs' first claim against the City fails. *See Monell v. Dep't of Soc. Servs. of N.Y.*, 436 U.S. 658, 691 (1978). Thus, summary judgment in favor of the City on this claim is appropriate. The Court instead addresses the City's potential liability under *Monell* in Section III.B below.

Here, the Court first analyzes the threshold issue of whether Officers Hand and Fuentes violated either Mr. Campos's Fourth Amendment rights or Plaintiffs' Fourteenth Amendment rights.

### 1.    Fourth Amendment – Deadly Force[2]

Plaintiffs' Fourth Amendment claim, brought on behalf of Mr. Campos, hinges on whether it was objectively reasonable for Officer Hand and Officer Fuentes to shoot Mr. Campos. (*See* First Am. Compl. ¶¶ 11–13, 26–32.) The officer who deployed the Taser against Mr. Campos prior to shots being fired—Officer Smyth—is not a defendant in this case. (*Id.* ¶¶ 4–8.) Accordingly, the Court focuses on Officer Hand's and Fuentes's use of deadly force against Mr. Campos and whether this force violated the Fourth Amendment.

"Under the Fourth Amendment, police may use only such force as is objectively reasonable under the circumstances." *Scott v. Henrich*, 39 F.3d 912, 914 (9th Cir. 1994). "An officer's use of deadly force is reasonable only if 'the officer has probable cause to believe that the suspect poses a significant threat of death or serious physical injury to the officer or others.'" *Gonzalez v. City of Anaheim*, 747 F.3d 789, 793 (9th Cir. 2014) (en banc) (quoting *Scott*, 39 F.3d at 914). "Factors relevant to assessing whether an officer's use of force was objectively reasonable include 'the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight.'" *Id.* (quoting *Graham v. Connor*, 490 U.S.

---

[2] "Fourth Amendment rights are personal rights which . . . may not be vicariously asserted." *Alderman v. United States*, 394 U.S. 165, 174 (1969). "In § 1983 actions, however, the survivors of an individual killed as a result of an officer's excessive use of force may assert a Fourth Amendment claim on that individual's behalf if the relevant state's law authorizes a survival action." *Moreland v. Las Vegas Metro. Police Dep't*, 159 F.3d 365, 369 (9th Cir. 1998). "The party seeking to bring a survival action bears the burden of demonstrating that a particular state's law authorizes a survival action and that the plaintiff meets that state's requirements for bringing a survival action." *Id.* Here, California state law authorizes a survival action, and there is no dispute that Plaintiffs are the successors-in-interest to Mr. Campos's estate. Therefore, they may assert a Fourth Amendment excessive force claim on Mr. Campos's behalf. *See, e.g., id.*

– 11 –

386, 396 (1989)). The most important factor is "whether the suspect posed an 'immediate threat to the safety of the officers or others.'" *Mattos*, 661 F.3d at 441 (en banc) (quoting *Smith v. City of Hemet*, 394 F.3d 689, 702 (9th Cir. 2005) (en banc)). "These factors are not exclusive." *Gonzales*, 747 F.3d at 793. Instead, the court must "consider the totality of the circumstances." *Id.* at 793–94 (citing *Bryan v. MacPherson*, 630 F.3d 805, 826 (9th Cir. 2010)).

In general, the Ninth Circuit has recognized "that an officer must give a warning before using deadly force 'whenever practicable.'" *Gonzales*, 747 F.3d at 794 (quoting *Harris v. Roderick*, 126 F.3d 1189, 1201 (9th Cir. 1997)). "Also relevant to reasonableness are the 'alternative methods of capturing or subduing a suspect' available to the officers." *Id.* (quoting *Smith*, 394 F.3d at 703).

Moreover, "[l]aw enforcement officials may not kill suspects who do not pose an immediate threat to their safety or to the safety of others simply because they are armed." *Harris v. Roderick*, 126 F.3d 1189, 1204 (9th Cir. 1997). However, "where a suspect threatens an officer with a weapon such as a gun or a knife, the officer is justified in using deadly force." *Smith*, 394 F.3d at 704 (collecting cases). "If the person is armed—or reasonably suspected of being armed—a furtive movement, harrowing gesture, or serious verbal threat might create an immediate threat." *George v. Morris*, 736 F.3d 829, 838 (9th Cir. 2013). Yet, "a simple statement by an officer that he fears for his safety or the safety of others is not enough; there must be objective factors to justify such a concern. In short, an officer's use of force must be objectively reasonable based on his contemporaneous knowledge of the facts." *Deorle v. Rutherford*, 272 F.3d 1272, 1281 (9th Cir. 2001). The court takes "the perspective of an officer on the scene without the benefit of 20/20 hindsight and consider[s] that 'police officers are often forced to make split-second judgments—in circumstances that are tense, uncertain, and rapidly evolving—about the amount of force that is necessary in a particular situation.'" *Gonzalez*, 747 F.3d at 794 (quoting *Graham*, 490 U.S. at 396–97).

Because the excessive force inquiry ordinarily "requires a jury to sift through disputed factual contentions, and to draw inferences therefrom," the Ninth Circuit has emphasized that "summary judgment . . . in excessive force cases should be granted sparingly." *Smith*, 394 F.3d at 701 (citing *Santos v. Gates*, 287 F.3d 846, 853 (9th Cir. 2002)). However, where there is no genuine issue of material fact, the question of whether or not an officer's actions were objectively reasonable is a "pure question of law." *Torres v. City of Madera*, 648 F.3d 1119, 1123 (9th Cir. 2011) (quoting *Scott v. Harris*, 550 U.S. 372, 381 n.8 (2007)).

In this case, the Court first addresses whether there is a genuine issue of material fact that prevents the Court from resolving Plaintiffs' Fourth Amendment claim at the summary judgment stage. The Court then individually analyzes Officer Hand's and Officer Fuentes's use of force to determine whether each officer's use of force was reasonable.

### a.      Genuine Issue of Material Fact

Under the summary judgment standard, Defendants bear the initial burden of demonstrating there is no genuine issue of material fact as to Plaintiffs' Fourth Amendment claim. *See Celotex*, 477 U.S. at 323. Here, the Court finds Defendants meet their initial production burden. Therefore, the burden shifts to Plaintiffs to go beyond the pleadings and "set forth specific facts showing that there is a genuine issue for trial." *See Anderson*, 477 U.S. at 250; *accord, e.g.*, *U.S. Postal Serv. v. Ester*, --- F.3d ---, 2016 WL 4709869, at *8 (9th Cir. 2016).

To meet their burden, Plaintiffs "must do more than simply show that there is some metaphysical doubt as to the material facts." *See Matsushita*, 475 U.S. at 586. "Where the record taken as a whole could not lead a rational trier of fact to find for [Plaintiffs], there is no 'genuine issue for trial.'" *See id.* at 587 (quoting *First Nat. Bank of Ariz. v. Cities Serv. Co.*, 391 U.S. 253, 288 (1968)). "The mere existence of a scintilla of evidence in support of [Plaintiffs'] position will be insufficient[.]" *See*

14cv0081

1   *Anderson*, 477 U.S. at 252. Thus, "there is no issue for trial unless there is sufficient
2   evidence favoring [Plaintiffs] for a jury to return a verdict for [them]. If the evidence
3   is merely colorable, or is not significantly probative, summary judgment may be
4   granted." *See McIndoe v. Huntington Ingalls Inc.*, 817 F.3d 1170, 1173 (9th Cir.
5   2016) (alteration omitted) (quoting *R.W. Beck & Assocs. v. City & Borough of Sitka*,
6   27 F.3d 1475, 1480 n.4 (9th Cir.1994)).

7        Here, the Court finds there is no genuine issue of material fact that precludes
8   the Court from determining whether Officers Hand's and Fuentes's conduct was
9   objectively reasonable as a matter of law. The parties have stipulated to almost every
10  fact underlying the incident. (*See* JSUF ¶¶ 1–47.) Thus, Plaintiffs do not dispute that
11  Officer Hand saw movements indicating that Mr. Campos was holding something
12  under his sweatshirt. (*Id*. ¶¶ 21, 23, 25.) It is similarly undisputed that Officer Hand
13  radioed to dispatch that Mr. Campos "had a knife," and that Officer Smyth
14  commanded Mr. Campos "in a loud voice to get on the ground or drop the knife."
15  (*Id.* ¶¶ 26, 31.) Further, several seconds after Mr. Campos rushed at Officer Hand
16  and the two officers shot Mr. Campos, Officer Fuentes can be heard on the footage
17  from his body camera warning that Mr. Campos still has a knife in his right hand.
18  (Fuentes Video at 01:18–01:22.) Nevertheless, in their Opposition and at oral
19  argument, Plaintiffs principally argued that there is a genuine issue of material fact
20  because Plaintiffs claim there is a dispute as to whether or not Mr. Campos had a
21  knife. In particular, Plaintiffs argue "indeed, whether there was ever a knife in Mr.
22  Campos' hand is a factual dispute in this case. Whether [D]efendants conspired to
23  cover up the fact that they shot an unarmed man and planted a weapon at the scene
24  is another factual dispute that cannot be resolved in a motion for summary judgment."
25  (Opp'n 20:3–9.)

26        The Court rejects Plaintiffs' claim that there is a genuine issue of material fact
27  for several reasons. Initially, whether or not Mr. Campos in fact had a knife is not
28  dispositive. If Mr. Campos was "reasonably suspected of being armed," then his

rushing towards an officer could create an immediate threat that justifies the use of deadly force. *See George*, 736 F.3d at 838; *accord Dague v. Dumesic*, 286 F. App'x 395, 396 (9th Cir. 2008) (concluding that, regardless of whether or not their perception "was in fact correct," the defendant officers were entitled to qualified immunity because their decision to shoot was based on "their perception that [the decedent] made a threatening movement with the hand he kept concealed during the stand-off").

Moreover, none of Plaintiffs' evidence disputes what transpired during the moments in which Mr. Campos rushed at Officer Hand and was shot by the officers—the key moments upon which the Court's ultimate conclusion rests. In arguing that Mr. Campos did not have a knife when he was rushing at Officer Hand, Plaintiffs rely on an unsigned declaration and primarily an assortment of hearsay statements.[3] However, even if all of this evidence is admissible, it does not create a genuine issue of material fact.

For example, Plaintiffs state that "three persons residing at 582 Trovita Court . . . saw that Mr. Campos was unarmed when he went past their residence being followed by Officer Hand." (Opp'n 6:22–7:1.) Plaintiffs rely on a "Follow-Up Investigation" report to make this claim (*see id.* 7:1–3), but this report is

---

[3] Defendants object to Plaintiffs' counsel's unsigned declaration filed in support of Plaintiffs' Opposition. (Defs.' Objs. 3:15–3:23, ECF No. 40-2.) Rule 56(c) provides a party may support its factual positions by citing to "affidavits or declarations." Fed. R. Civ. P. 56(c)(1); *see also* Fed. R. Civ. P. 56(c)(4). To be adequate, a declaration must be signed by the person making the statement as true under penalty of perjury, dated, and substantially in the form specified by statute. *See* 28 U.S.C. § 1746. Plaintiffs' counsel's declaration does not comply with 28 U.S.C. § 1746 because it is not signed, and it also does not comply with this Court's rule regarding electronic signatures—Section 2(f) of the Court's Electronic Case Filing Administrative Policies and Procedures Manual. Moreover, Plaintiffs' counsel has not made any effort to rectify this problem. He has not responded to Defendants' objection, filed an adequate declaration, or requested permission to do so. Therefore, the Court sustains Defendants' objection. *See* 28 U.S.C. § 1746; *see also, e.g.*, *Wilson v. City of Merced*, No. CV F07-1235LJODLB, 2008 WL 4737159, at *4 (E.D. Cal. Oct. 28, 2008) ("An unsigned declaration is inadmissible to oppose a [motion for] summary judgment.").

inadmissible.[4] Yet, even if the Court were to consider this report and accept the statements contained within the report as true, these statements do not create a genuine issue of material fact because none of the residents was an eye witness to the shooting or contests what was occurring during the moments before the shooting.

Specifically, the report's entry for 582 Trovita Ct. discusses interviews with four residents—Mr. Tan Huyhn, Mr. Lam Huynh, Ms. Nu Luc, and Ms. Thanh Huynh. (*Id.*) When interviewed, Mr. Tan Huynh stated he "did not witness the actual shooting," and "he did not see Suspect Pedro Campos in the street." (*Id.*) Mr. Tan Hunyh's mother, Ms. Nu Luc, "mentioned that she heard something, but not gunshots and she did not see anything." (*Id.*) Thus, these summarized statements do not support Plaintiffs' claim that there is a genuine issue of material fact.

The other two residents, Mr. Lam Huynh and Ms. Thanh Huynh, state they saw Officer Hand and Mr. Campos while unloading their car after arriving home. (Opp'n Ex. H at 2–3 (582 Trovita Ct.).) Mr. Lam Huynh executed a declaration that mirrors several of the statements that the investigative report contains. (Huynh Decl., ECF No. 39-2.) In his declaration, Mr. Lam Huynh states he "did not hear the man [(Mr. Campos)] respond to the officer or saw this subject with any weapons." (*Id.* ¶

---

[4] Defendants object to Plaintiffs' Exhibit H—an investigation report—because it contains multiple levels of hearsay, including "summaries of various unverified statements . . . ." (Defs.' Objs. 5:10–24.) A party may object to evidence submitted in opposition to a motion for summary judgment when "the material cited . . . cannot be presented in a form that would be admissible in evidence." Fed. R. Civ. P. 56(c)(2). Upon objection, the proponent of the evidence has the burden "to show that the material is admissible as presented or to explain the admissible form that is anticipated." *Id.* advisory committee note to 2010 amendment. Here, Plaintiffs do not respond to Defendants' objection, and the Court agrees that Exhibit H contains hearsay. *See* Fed. R. Evid. 801(c). Further, the public records hearsay exception is inapplicable because Plaintiffs are relying on the report for summaries of hearsay statements made by third parties. *See, e.g.*, *United States v. Pazsint*, 703 F.2d 420, 424 (9th Cir. 1983); *accord Shehada v. Tavss*, 965 F. Supp. 2d 1358, 1374 (S.D. Fla. 2013) (recognizing that while factual findings in "internal affairs reports are generally admissible[,] . . . summaries of interviews . . . are [ ] double hearsay that cannot be admitted at trial or considered on summary judgment"). Therefore, the Court sustains Defendants' objection to Plaintiffs' Exhibit H. *See Orr v. Bank of Am., NT & SA*, 285 F.3d 764, 778–79 (9th Cir. 2002) (affirming the district court's exclusion of exhibits that contained hearsay at summary judgment phase and noting that the plaintiff could not rely on one of the exhibits "because it is inadmissible hearsay").

14cv0081

1.) Because the reasonableness inquiry requires the Court to consider "exactly what was happening when the shot[s] [were] fired," the Court must place Mr. Huynh's statements into the timeline of events that unfolded involving the officers and Mr. Campos. *See Gonzales*, 747 F.3d at 794.

Upon doing so, the Court notes that Mr. Lam Huynh was also not an eye witness to the shooting. (*See* Huynh Decl. ¶ 3.) While unloading his car at home on the night of the incident, Mr. Lam Huynh "did not s[ee] [Mr. Campos] with any weapons." (*Id.* ¶ 1.) He then entered his home with his wife and child. (*Id.* ¶ 3.) When Mr. Lam Huynh "went back outside to get something from [his] car, [t]here were now a number of police cars at the intersection of Washington and Trovita Court and [he] could hear voices down the street from [him] where the shooting occurred." (*Id.*) Therefore, by this time, Officer Fuentes had or was arriving on the scene. (*See* Fuentes Video at 00:27–00:35; Fuentes Decl. ¶ 7.) Mr. Lam Huynh heard the officers' commands that were captured on Officer Fuentes's body camera and are described above. (*See* Huynh Decl. ¶ 3; *see also* Fuentes Video at 00:48–01:05.) He "then heard the gunshots." (Huynh Decl. ¶ 3.)

Accordingly, Mr. Lam Huynh's declaration, like the statements from other residents, does not dispute what was happening during the moments when Officer Fuentes and Officer Hand employed deadly force against Mr. Campos—the key moments upon which the Court ultimately concludes the officers' conduct was reasonable as a matter of law below. *See MacEachern v. City of Manhattan Beach*, 623 F. Supp. 2d 1092, 1104 (C.D. Cal. 2009) (finding no genuine issue of material fact where two witnesses stated they did not see a knife in the decedent's hands prior to the confrontation with the officer because these witnesses could "not see [the decedent]'s hands at the time of the confrontation"). Although she has not filed a declaration and the Court can examine only the summary of her interview, the Court reaches the same conclusion after reviewing Ms. Thanh Huynh's statements. She reports that she did not see anything in Mr. Campos's hands when she was outside

her home by her car and her husband, but she later went inside their house—where she then heard gunshots. (*See* Opp'n Ex. H at 2–3 (582 Trovita Ct.).) Therefore, she, too, was not an eye witness to the shooting and does not dispute what was happening during the moments before the shooting. Thus, her statements also do not create a genuine issue of material fact. *See MacEachern*, 623 F. Supp. 2d at 1104.

The Court similarly concludes that Plaintiffs' other evidence does not raise a genuine issue of material fact.[5] At best, Plaintiffs have put forth a "scintilla of evidence" in support of their position, *see Anderson*, 477 U.S. at 252, which is "merely colorable" and is "not significantly probative" to create a genuine issue of material fact, *see McIndoe*, 817 F.3d at 1173.

Furthermore, the Court does not adopt Plaintiffs' version of the facts—their claim that that Defendants' conspired to cover up the fact that they shot an unarmed man and planted a weapon at the scene—because this version "is blatantly contradicted by the record, so that no reasonable jury could believe it." *See Scott*, 550 U.S. at 380. To determine whether their conduct was reasonable, the Court takes "the perspective of [the] officer[s] on the scene without the benefit of 20/20 hindsight." *See Gonzales*, 747 F.3d at 794. However, to the extent that Plaintiffs claim there is an overarching conspiracy at issue that involves a planted knife and police cover up, the remainder of the record is relevant. This evidence includes an Escondido Police Department Laboratory Request that states no fingerprints were found on a knife that is presumably the knife found at the scene. This report does not change the Court's conclusion that no reasonable jury could accept Plaintiffs' theory, however, because of the abundance of other evidence in the record. This evidence includes, among other items: Officer Hand's report to dispatch before the shooting that Mr. Campos had a knife; Officer Fuentes's warning about a knife in Mr. Campos's hand seconds after the shooting; the statements from multiple officers that Officer Fuentes kicked

---

[5] Many of Defendants' remaining objections to Plaintiffs' evidence are well taken. However, because the Court reaches its ultimate conclusion in this Order regardless of whether or not these objections are sustained, the Court need not rule on each of Defendants' objections.

the knife out of Mr. Campos's hand after giving his warning; the statement from the Escondido Fire Department's report that a knife was observed near Mr. Campos when responders arrived on the scene; Mr. Campos's statements to Ms. Zwer before the 9-1-1 call; and Mr. Campos's handwritten note in his pocket. When the entire record is considered, as opposed to only what the officers knew prior to using deadly force, no reasonable jury could adopt Plaintiffs' theory that the officers shot an unarmed man and then quickly, within seconds, conspired to plant a knife and cover up the fact afterwards. *See Harris*, 550 U.S. at 380; *see also MacEachern*, 623 F. Supp. 2d at 1109 (finding no reasonable jury could accept the plaintiff's claim that the defendants "conspired to cover-up the true facts related to the shooting" in a case involving several similar unsupported conspiracy allegations).

In sum, the Court finds there is no genuine issue of material fact that precludes the Court from determining whether Officers Fuentes's and Hand's actions were reasonable as a matter of law.

### b. Reasonableness
#### i. Officer Fuentes's Use of Force

The Court turns to whether each officer's use of deadly force was reasonable. The Court takes the perspective of Officer Fuentes "on the scene without the benefit of 20/20 hindsight." *See Graham*, 490 U.S. at 396. Officer Fuentes advised the police dispatch that he would respond to the 9-1-1 call placed by Mr. Campos to assist with translation services. (JSUF ¶ 19.) He did not receive "any specific details as to the type of assistance needed by the caller." (*Id.* ¶ 17.) However, before he arrived, he heard Officer Hand's relay to dispatch that the subject had a knife and that he needed backup. (*Id.* ¶ 26; *see also* Fuentes Decl. ¶ 6.)

Then, as depicted in the footage from his body camera, Officer Fuentes hurries to the scene. (Fuentes Decl. ¶¶ 5–8; *see also* Fuentes Video at 00:08–00:35.) Upon arriving, he runs towards the location of Officer Hand and Mr. Campos as he hears

the other officers shouting commands in the distance. (Fuentes Decl. ¶¶ 8–9; *see also* Fuentes Video at 00:35–1:05.) Officer Fuentes then sees Mr. Campos, who had his "right hand in and/or under his shirt or sweatshirt . . . beg[in] to pull his hand out from underneath his shirt or sweatshirt." (Fuentes Decl. ¶ 11.) This movement indicates to him that Mr. Campos is "trying to pull out some weapon," and Mr. Campos appears "to struggle to get his right hand out from underneath his shirt or sweatshirt." (*Id.*) Officer Smyth discharges his Taser, but it appears to be ineffective. (JSUF ¶ 34.) Mr. Campos then turns towards Officer Hand and starts rushing towards the officer. (Fuentes Decl. ¶¶ 12–13; Fuentes Video at 01:08–01:10; *see also* Smyth Decl. ¶¶ 13–14; Hand Decl. ¶ 13.) At this point, Officer Fuentes cannot clearly see what is in Mr. Campos's hand but fears that Mr. Campos is "going to stab Officer Hand with a knife or [ ] [is] going to pull out another weapon to inflict great bodily harm on the officer." (Fuentes Decl. ¶ 12.) He therefore fires at Mr. Campos "as Officer Hand trie[s] to move into the street and out of the line of [Mr. Campos]'s movement." (JSUF ¶ 35; *see also* Fuentes Video at 01:09–1:11.)

Here, the Court finds Officer Fuentes's use of deadly force did not violate the Fourth Amendment. The "most important" factor in determining whether Officer Fuentes's use of force was objectively reasonable is whether Mr. Campos "posed 'an immediate threat to the safety of the officers or others.'" *See Mattos*, 661 F.3d at 441 (en banc) (quoting *Smith*, 394 F.3d at 702 (en banc)). Officer Fuentes believed that Mr. Campos posed an immediate threat to the safety of Officer Hand when Mr. Campos began rushing at the officer, and this belief is supported by objective factors. Officer Fuentes heard Officer Hand advise dispatch that the individual had a knife and that he needed backup, but that fact is not necessary for him to have a reasonable suspicion that Mr. Campos was armed. Officer Fuentes also witnessed Mr. Campos make a movement indicating that he was trying to pull out a weapon, and he saw, after an unsuccessful Taser attempt, Mr. Campos pull out his hand from underneath his clothing as he started rushing at Officer Hand.

1    Moreover, as seen in the footage from his body camera, Officer Fuentes
2    encountered circumstances that were "tense, uncertain, and rapidly evolving." *See*
3    *Graham*, 490 U.S. at 396. He perceived Mr. Campos making a "threatening
4    movement" with his hand. *See Dague*, 286 F. App'x at 396. Moments later, Mr.
5    Campos rushed towards Officer Hand. Thus, whether or not Officer Fuentes's
6    perception that Mr. Campos was withdrawing a weapon "was in fact correct," his
7    decision to shoot Mr. Campos "is the type of split-second judgment' which [this
8    Court] cannot second-guess." *See id.* at 396; *see also Graham*, 490 U.S. at 396–97
9    ("The calculus of reasonableness must embody allowance for the fact that police
10   officers are often forced to make split-second judgments . . . about the amount of
11   force that is necessary in a particular situation.").

12       Further, when Mr. Campos was rushing at Officer Hand, it was not feasible for
13   Officer Fuentes to give a warning prior to discharging his weapon. Officer Fuentes
14   had only "1-2 seconds to make the decision to shoot." (JSUF ¶ 35.) Therefore,
15   although "an officer must give a warning before using deadly force 'whenever
16   practicable,'" it was not practicable here. *See* Gonzales, 747 F.3d at 794 (quoting
17   *Harris*, 126 F.3d at 1201).

18       Last, the Court recognizes that an officer's awareness that an individual is
19   emotionally disturbed is another factor that is relevant to the reasonableness inquiry.
20   *See, e.g.*, *Glenn v. Wash. Cty.*, 673 F.3d 864, 875 (9th Cir. 2011). Officer Fuentes,
21   however, did receive any specific details as to the type of assistance needed by the 9-
22   1-1 caller, and he was on the scene for less than sixty seconds before shots were fired.
23   Officer Fuentes therefore had no indication that Mr. Campos was despondent and
24   had stated before he called 9-1-1 that "he didn't want to live anymore and was going
25   to hurt himself." (JSUF ¶ 12.) Consequently, this factor does not weigh against
26   concluding Officer Fuentes's use of deadly force was reasonable.

27       Accordingly, based on the totality of the circumstances, the Court concludes
28   Officer Fuentes's use of deadly force did not violate Mr. Campos's Fourth

Amendment rights as a matter of law. Thus, the inquiry ends here, and summary judgment on Plaintiffs' Fourth Amendment claim in favor of Officer Fuentes is appropriate. *See, e.g.*, *Pearson v. Callahan*, 555 U.S. 223, 236 (2009) ("In some cases, a discussion of why the relevant facts do not violate clearly established law may make it apparent that . . . the relevant facts do not make out a constitutional violation at all.")

### ii.   Officer Hand's Use of Force

The Court similarly steps into the shoes of Officer Hand to determine whether his use of force was reasonable. During the encounter fully-described above, Officer Hand responds to "an incomplete 9-1-1 call from a male requesting police assistance," but he does not receive "any specific details as to the type of assistance needed by the caller." (JSUF ¶¶ 16–17.) He arrives to find a male near the sidewalk in the street. (*Id.* ¶ 20.) A vehicle driving eastbound in front of Officer Hand swerves around Mr. Campos. (*Id.*) Believing Mr. Campos is the man who called 9-1-1, Officer Hand pulls over and parks his patrol car "after noticing that one of [Mr. Campos]'s hands [is] underneath his sweatshirt and the other hand [is] in his pocket." (*Id.* ¶ 21.) Officer Hand then tries to speak with Mr. Campos, tries to have him sit down so that he can help him, and then asks Mr. Campos to show his hands for safety reasons because it is dark and his hands are hidden. (*Id.* ¶¶ 22–23.) He also observes Mr. Campos switching positions with his hands underneath his sweatshirt several times. (*Id.* ¶ 25.)

Officer Hand then sees a knife, requests Code 3 cover, and positions himself "approximately 12 – 15 feet away" from Mr. Campos while walking south with him. (JSUF ¶ 29.) He continuously orders Mr. Campos to "stop and get on the ground," and Officer Smyth also commands Mr. Campos to "get on the ground or drop the knife." (*Id.* ¶ 30.) Then, as Officer Fuentes arrives, Officer Smyth deploys his Taser, but it is ineffective. (*Id.* ¶¶ 32–35.) From Officer Hand's perspective—a different

1  angle than that captured by Officer Fuentes's body camera—Mr. Campos "lift[s] the

2  knife and beg[ins] to run directly towards [Officer Hand] on the sidewalk with the

3  knife lifted at his waist and pointed towards [Officer Hand]." (Hand Decl. ¶ 13.)

4  Officer Hand then fires his weapon at Mr. Campos "two times as [he] [is] trying to

5  move into the street and out of his line of movement." (*Id.*; *see also* JSUF ¶ 35.)

6      Here, for many of the same reasons that are articulated above in connection

7  with Officer Fuentes's use of force, the Court concludes Officer Hand's use of force

8  was reasonable. Again, the key factor in determining whether this use of force was

9  reasonable is whether Mr. Campos posed an immediate threat to the safety of the

10  officer or others. *See Mattos*, 661 F.3d at 441. From Officer Hand's perspective, he

11  saw Mr. Campos had a knife during the earlier portion of the encounter, and he then

12  saw Mr. Campos lift the knife and begin to run directly towards him after Officer

13  Smyth's unsuccessful Taser deployment. Thus, given that Officer Hand perceived

14  that Mr. Campos was threatening him with a weapon and running towards him, his

15  use of deadly force was justified. *See Smith*, 394 F.3d at 689 ("[W]here a suspect

16  threatens an officer with a weapon such as a gun or a knife, the officer is justified in

17  using deadly force."). In addition, like Officer Fuentes, it was not practicable for

18  Officer Hand to give a warning prior to using deadly force because he had only "1-2

19  seconds to make the decision to shoot." (JSUF ¶ 35.)

20      As to Mr. Campos's distressed emotional state, Officer Hand similarly did not

21  know that Mr. Campos had expressed suicidal tendencies to Ms. Zwer the night of

22  the incident. Unlike Officer Fuentes, however, Officer Hand did have interactions

23  with Mr. Campos during a period of only a few minutes that could have indicated

24  Mr. Campos was emotionally distressed. That said, Officer Hand's circumstances are

25  distinguishable from cases where officers are clearly put on notice that they are

26  dealing with an emotionally troubled individual—such as where dispatch warns

27  officers that the subject is "(1) suicidal and very intoxicated, (2) ha[s] a history of

28  suicide attempts, and (3) [is] the son of the [9-1-1] caller rather than a criminal

1   intruder." *See Glenn*, 673 F.3d at 875. Further, there was no one at the scene, such as

2   a family member, to "explicitly [tell the] officers that [Mr. Campos] was 'only

3   threatening to hurt himself.'" *See id.* And, critically, this is not a case where Mr.

4   Campos was only threatening himself. When he rushed towards Officer Hand, the

5   risk calculus changed, and Officer Hand's use of force was reasonable—

6   notwithstanding that the officer may have had some indication that he was dealing

7   with an emotionally distressed individual. He had no physical barrier to protect

8   himself from Mr. Campos's advancement, and Officer Hand was forced to make the

9   "type of split-second judgment' which [this Court] cannot second-guess." *See Dague*,

10  286 F. App'x at 396; *see also Graham*, 490 U.S. at 396–97 ("The calculus of

11  reasonableness must embody allowance for the fact that police officers are often

12  forced to make split-second judgments . . . about the amount of force that is necessary

13  in a particular situation."). Moreover, Plaintiffs have not produced evidence of any

14  "specific pre-shooting tactical errors made by the Defendants." (*See* JSUF ¶ 46.)

15  Thus, based on the totality of the circumstances, the Court concludes Officer

16  Hand's use of deadly force did not violate the Fourth Amendment as a matter of law.

17  Consequently, summary judgment on Plaintiffs' Fourth Amendment claim in favor

18  of Officer Hand is warranted.

19

20  **2.   Fourteenth Amendment – Familial Association**

21  Plaintiffs also assert on their own behalf—as Mr. Campos's parents—that they

22  have been deprived of a familial relationship with Mr. Campos in violation of their

23  Fourteenth Amendment right to substantive due process. This claim "requires the

24  plaintiffs to prove that the officers' use of force 'shock[ed] the conscience.'"

25  *Gonzalez*, 747 F.3d at 797 (alteration in original) (quoting *Porter v. Osborn*, 546 F.3d

26  1131, 1137 (9th Cir. 2008)). Where the officers do "not have time to deliberate, a use

27  of force shocks the conscience only if the officers had a 'purpose to harm' the

28  decedent for reasons unrelated to legitimate law enforcement objectives." *Id.*; *accord*

1  *Wilkinson v. Torres*, 610 F.3d 546, 554 (9th Cir. 2010) ("[W]here a law enforcement

2  officer makes a snap judgment because of an escalating situation, his conduct may

3  only be found to shock the conscience if he acts with a purpose to harm unrelated to

4  legitimate law enforcement objectives."). Summary judgment on a Fourteenth

5  Amendment familial association claim is appropriate if (1) the "purpose to harm"

6  requirement applies, and (2) the plaintiffs "produce[ ] no evidence that the officers

7  had any ulterior motives for using force against" the decedent. *See Gonzales*, 747

8  F.3d at 797–98.

9        Here, Officers Hand and Fuentes are entitled to summary judgment on

10  Plaintiffs' Fourteenth Amendment claim because a reasonable jury could not find

11  that the officers' use of force shocks the conscience. Initially, this conclusion is

12  warranted because Plaintiffs' Fourteenth Amendment claim is subject to a higher

13  standard than their Fourth Amendment claim brought on Mr. Campos's behalf.

14  Because Officer Hand's and Officer Fuentes's use of force was reasonable for the

15  reasons discussed above, Plaintiffs cannot satisfy the more stringent "shocks the

16  conscience" standard.

17        In addition, summary judgment on this claim is appropriate regardless of the

18  Court's conclusion as to Plaintiffs' Fourth Amendment claim. Once the situation

19  escalated and Mr. Campos started rushing at Officer Hand, it is undisputed that both

20  Officer Hand and Officer Fuentes "only had 1-2 seconds to make the decision to

21  shoot." (JSUF ¶ 37.) Therefore, both Officer Hand and Officer Fuentes "did not have

22  time to deliberate," and their "use of force shocks the conscience only if the officers

23  had a 'purpose to harm' [Mr. Campos] for reasons unrelated to legitimate law

24  enforcement objectives." *See Gonzalez*, 747 F.3d at 797.

25        Plaintiffs cannot satisfy the "purpose to harm" requirement here. They provide

26  no evidence that either Officer Hand or Officer Fuentes had a purpose to harm Mr.

27  Campos for reasons unrelated to legitimate law enforcement objectives. For example,

28  Plaintiffs neither argue nor provide evidence that Officer Hand or Officer Fuentes

14cv0081

1    used the force at issue to "bully" Mr. Campos or to "get even." *See Wilkinson*, 610

2    F.3d at 554. Further, Plaintiffs do not address their Fourteenth Amendment claim in

3    their Opposition, and they submitted on this issue at oral argument.

4         Accordingly, because Plaintiffs provide no evidence that Officer Hand's or

5    Officer Fuentes's use of force shocks the conscience, the officers are entitled to

6    summary judgment on this claim. *See Gonzalez*, 747 F.3d at 797 (holding the district

7    court properly granted summary judgment on the plaintiffs' Fourteenth Amendment

8    claim where "[t]he plaintiffs produced no evidence that the officers had any ulterior

9    motives for using force against [the decedent]").

10

11        **B.    Section 1983 *Monell* Claim – City of Escondido**

12        Plaintiffs also bring a claim against the City under 42 U.S.C. § 1983 and

13   *Monell v. Department of Social Services of the City of New York*, 436 U.S. 658

14   (1978). In *Monell*, "the Supreme Court held that a municipality may not be held liable

15   for a § 1983 violation under a theory of respondeat superior for the actions of its

16   subordinates." *Castro v. Cty. of L.A.*, --- F.3d ---, 2016 WL 4268955 (9th Cir. 2016)

17   (en banc). Instead, a municipality is responsible for a constitutional violation only

18   when an "action [taken] pursuant to [an] official municipal policy of some nature"

19   caused the violation. *Monell*, 436 U.S. at 691. Further, the plaintiff must demonstrate

20   that the policy of the municipality "reflects deliberate indifference to the

21   constitutional rights of its inhabitants." *City of Canton v. Harris*, 489 U.S. 378, 392

22   (1989).

23        Thus, in order to establish that the City is liable under 42 U.S.C. § 1983,

24   Plaintiffs must prove: (1) that Mr. Campos or Plaintiffs possessed a constitutional

25   right of which he or they were deprived; (2) that the City had a policy; (3) that this

26   policy amounts to deliberate indifference to the constitutional right; and (4) that the

27   policy is the moving force behind the constitutional violation. *See Dougherty v. City*

28   *of Covina*, 654 F.3d 892, 900 (9th Cir. 2011). "A policy can be one of action or

– 26 –

1  inaction." *Long v. Cty. of L.A.*, 442 F.3d 1178, 1185 (9th Cir. 2006) (citing *City of*

2  *Canton*, 489 U.S. at 388). Further, the policy at issue may be either formal or

3  informal. *See City of St. Louis v. Praprotnik*, 485 U.S. 112, 127 (1988). An informal

4  policy exists when a plaintiff can "prove the existence of a widespread practice that,

5  although not authorized by written law or express municipal policy, is 'so permanent

6  and well settled as to constitute a 'custom or usage' with the force of law.'" *Id.*

7  (quoting *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 167–68 (1970)).

8      In this case, summary judgment on Plaintiffs' *Monell* claim against the City is

9  appropriate for two reasons. First, because the Court has concluded Plaintiffs' and

10  Mr. Campos's constitutional rights were not violated, Plaintiffs cannot demonstrate

11  a deprivation of a constitutional right to serve as the foundation for their *Monell*

12  claim. *See Dougherty*, 654 F.3d at 900 (noting a plaintiff must prove that there has

13  been a deprivation of a constitutional right to establish municipal liability).

14      Second, independent of whether or not a constitutional right has been violated,

15  Plaintiffs provide no evidence to support their *Monell* claim. Plaintiffs do not point

16  to any formal policy of the City that was a moving force behind the alleged

17  constitutional violations. Rather, in their Opposition, Plaintiffs generally argue that

18  the City failed to train Officers Hand and Fuentes. (Opp'n 21:14–21.)  A "[f]ailure

19  to train may amount to a policy of 'deliberate indifference' if the need to train was

20  obvious and the failure to do so made a violation of constitutional rights likely."

21  *Dougherty*, 654 F.3d at 900 (citing *City of Canton*, 489 U.S. at 390). "Mere

22  negligence in training or supervision, however, does not give rise to a *Monell* claim."

23  *Id.*

24      Here, Plaintiffs provide no evidence that the City failed to train its officers,

25  including Officers Hand and Fuentes. (*See* Opp'n 21:14–21.) For example, Plaintiffs

26  do not submit evidence that the City's training program was inadequate in the first

27  instance or that the lack of training amounted to a policy of deliberate indifference.

28  *See, e.g.*, *Johnson v. Hawe*, 388 F.3d 676, 686 (9th Cir. 2004) (concluding there was

14cv0081

a genuine issue of fact as to the plaintiff's *Monell* claim because the plaintiff offered expert testimony that a "self-training" program amounted to a "failure to train" for purposes of municipal liability); *see also Flores v. Cty. of L.A.*, 758 F.3d 1154, 1159 (9th Cir. 2014) (noting the plaintiff "must demonstrate a 'conscious' or 'deliberate' choice on the part of a municipality in order to prevail on a failure to train claim," such as that the municipality "disregarded the known or obvious consequence that a particular omission in [its] training program would cause [municipal] employees to violate citizens' constitutional rights" (second alteration in original)). Moreover, when asked at oral argument about the dearth of evidence to support their *Monell* claim, Plaintiffs referred back to their papers and therefore submitted on this claim as well.

Accordingly, because Plaintiffs provide no evidence that the City had a policy, including a failure to train officers, that amounted to deliberate indifference as to Plaintiffs' or Mr. Campos's constitutional rights, summary judgment in favor of the City on this claim is warranted. *See, e.g.*, *Sandoval v. Las Vegas Metro. Police Dep't*, 756 F.3d 1154, 1168 (9th Cir. 2014) (affirming grant of summary judgment against the plaintiffs on their *Monell* claim because their "bare-bones allegations of municipal liability" were insufficient to establish municipal liability).

\* \* \*

The Court has resolved all of Plaintiffs' claims that provide a basis for original jurisdiction. Under 28 U.S.C. § 1367, the Court may "decline to exercise supplemental jurisdiction" over Plaintiffs' remaining four state law claims if it "has dismissed all claims over which it has original jurisdiction." *See also, e.g.*, *Sanford v. MemberWorks, Inc.*, 625 F.3d 550, 561 (9th Cir. 2010) ("[I]n the usual case in which all federal-law claims are eliminated before trial, the balance of factors to be considered under the pendent jurisdiction doctrine . . . will point toward declining to exercise jurisdiction over the remaining state-law claims."). Here, all of Plaintiffs'

– 28 –

14cv0081

federal claims will be eliminated before trial because the Court is granting summary judgment on Plaintiffs' first and second claims. In addition, the Court declines to exercise supplemental jurisdiction over Plaintiffs' California state law negligence, battery, Civil Code Section 52.1, and civil conspiracy claims. *See* 28 U.S.C. § 1367(c)(3). Consequently, these four state law claims will be dismissed without prejudice.

## IV.    CONCLUSION

In light of the foregoing, the Court **GRANTS IN PART** Defendants' motion for summary judgment (ECF No. 30). Specifically, the Court grants summary judgment in favor of Defendants on Plaintiffs' first claim. The Court also grants summary judgment in favor of the City on Plaintiffs' second claim. Further, the Court declines to exercise supplemental jurisdiction over Plaintiffs' third, fourth, fifth, and sixth claims brought under California state law and therefore dismisses these claims without prejudice. Thus, the Court does not reach Defendants' request for summary judgment on Plaintiffs' state law claims. The Clerk of the Court is directed to enter judgment accordingly and close this case.

IT IS SO ORDERED.


DATED:  September 30, 2016

Hon. Cynthia Bashant
United States District Judge